Okay, the next argued case is number 182363, Neurographics Against Brain Lab. Mr. Philip. Good morning, Your Honor. I'm pleased to be here and honored and close with my good friend, Mr. J. Campbell. I've talked to him many times over the years, including wrote up a section on a book I wrote about patents some time ago about his arguments and attorney's fees in Medtronix versus Brain Lab, Neurographics and Serif versus Brain Lab. So what I want to do is to make three points here. Firstly, I'd like to show that absolutely this patent was infringed by Brain Lab and Memorial Sloan Kettering and inducement to that. I'd like to show that the way that the court disposed of motions from a judgment by finding that the patent did not apply to unknown tracks is a complete misunderstanding of the patent. And because of this, there is no non-infringing, substantial non-infringing use. Can I just hope that you will focus on what's in my mind, tell you a little bit about what's in my mind and maybe it will fit with what you're trying to say or not. I was focused on kind of two arguments that I take you to be making. One of them is a claim construction argument about selected structure and that all that means is that it is a brain structure that the user of this method chooses to subject to the process of scanning, etc. And that it plainly does not require that one knows either the specific location or the orientation of the selected structure. It just means identifying the structure that you are subjecting this diffusion tensor imaging process to. Because after all, the whole point of this process is to produce an accurate map of the orientation and location. You don't have to know it in advance. And that the district court was simply wrong about the claim construction to the extent it went beyond that. And the second is a procedural point, which is that you could not be faulted for not putting on in response to the summary judgment motion a whole lot of evidence about what users of the, what's the software that you called? Brain lab fiber tracking. What's it? Fiber tracking. Fiber tracking. Because that was not actually the argument that they made a summary judgment motion on. They never said if all you need is identifying the structure that you are going to subject, you know, put through this process, that nobody does that. And therefore, it completely doesn't matter whether you didn't submit a whole lot of evidence. Yes, those are two arguments at the core of what I have to say. So to fill that in, I mean, this court in Intelligent Biosystems versus Illumina, 2016, and before that, Abbott Laboratories versus Sandoz, 2009, addressed this conundrum that, well, we certainly couldn't have claimed something unknown in the claims. Would that make it a claim indefinite? But what's happening in Abbott is you have a product by process, and the product's unknown, but you say, well, hey, we have a process. And if you look at this Intelligent Biosystems, very similar. We're sequencing DNA. The DNA sequence is unknown. It's not that we don't know that it's DNA. So, yes, the court finds that since there are some areas that are unknown, that must be a substantial non-inferential use. And this is completely wrong because the whole purpose of the patent, as you just stated, is to map, find the direction of unknown tissues. In fact, Claim 36… That's what it says in the preamble, in fact. This is a process for the purpose of determining the shape and position of a structure. It would be very odd to interpret claim language in here that says you have to know that in advance before you run the process. Absolutely, because the – and in fact, even Claim 36 is generally – we have a picture of celery it's used on. Claim 37 attaches to mammals and neural tissues, but 36 is very broad because this is the solution, is that we had a way with MRI. When the direction is known to the peripheral nerve in the arm, because we could see the direction of diffusion, which is anisotropic, primarily down a nerve, not isotropic diffusion in all directions. So the consequence of that is if you have an anisotropic flow in a nerve, if you turn the gradient so first it's parallel and then it's perpendicular, in one image the nerve will be bright, the other will be dark. But if you have isotropic or uniformly diffusing water, then it's the same image intensity no matter how you point the gradient. But when we have complex curving nerve structures, how do we know which way to point our gradient? And my solution was, the solution in this invention, is take the image from multiple directions and carry out mathematics, that's the tensor bit, to determine the vector orientation on a voxel-by-voxel basis. So it's a single voxel, which is the unit at which we measure the direction and do a calculation. We fill each little voxel with a vector, and that is discovering the direction of the tissue or structure. And after claim 37, neural tissue in a mammal, and then we go on in subsequent claims, 39, to it over multiple sections, and run an arrow between them, follow on to the next and have these tracks. And the appendix 06-050, figure 9, they tell us, Maristan Kettering, you're using brain-lab fiber tracking. It's a great, great image because it sweeps across all of neuroscience and right into this patent. Because they tell us that they have used functional MRI, fMRI, a different method. And these are materials that were, in fact, attached to your opposition to summary judgment or no? You have a real problem if you are relying on the proposition, as much of your brief does but not all of it, that the district court, the MDL district court, erred in declining to consider a lot of articles, a lot of evidence, that you attached to your proposed amended complaint but did not cite in the summary judgment. That's a tough thing to cite. But I think that in order for the court to think about reaching across that and listen to argument, you have to know that if you did reach across it, there is solid evidence of direct negligence. Let's assume that. But you've got to make legal arguments about why Judge Stearns was wrong in what he did. And one is he agreed with you on like two and a half of the claim constructions. You don't have to have zero anisotropic. It doesn't have to be zero anisotropic. The second one about only peripheral nerves recovered, he agreed with you about that. And then what it then came down to was some notion of what exactly a selected structure is. And it seems to me the opinion is not all that clear about that. But the argument that they made on that point was that you actually needed to know in one of their declarations the location and in the other was, I think, the orient. There were three declarations. I forget what the names were. Mosley, Tseng, and somebody else. And they all talked about assuming that you knew the location, the position, and or orientation. And if you're fighting the claim construction, saying, no, no, you don't need to know that. That's a legal argument that's available to you, which is a certain opinion. And that is very key because in the patent, this is at appendix 0217, there's a series of paragraphs to discuss. We're measuring unknown orientation, the word unknown again and again. We're measuring unknown orientations. But the spec repeatedly says, this is a lot easier if you actually know the orientation because then you know what's perpendicular, what's orthogonal, etc. But if you don't know it, pick a random one and start and you'll find it. Yes, exactly. So it's completely wrong. He's just errored completely because he goes through it all. And then Sterns comes through and says, ah, but there must be something unknown here. And this is very much like saying, well, we don't know the exact margins of someone's femur, but therefore we can't measure it because it's unknown. No, we know exactly where the femur is. We know exactly how to take a picture of it. We just don't know the exact shape. And this is what this does is it solves exact shape.  It's finding the orientation of tissue. So because the court finds that there is a substantial non-infringing use incorrectly, they say, well, since there's something unknown and they look at unknown, you look at known, therefore there's a substantial non-infringing use. They look to Toshiba case, which says that, well, if there is a substantial non-infringing use, and that was one where they were making DVDs. I'm sorry, why are we talking about substantial non-infringing use? There was an inducement claim and a direct infringement claim. There was no contributory infringement claim for which substantial non-infringing use is relevant. Well, it's because he uses that argument to say that you need to pull direct evidence into the opposition. But I thought you're, I guess, you say a bunch of different things in your brief in response to that. The one that I guess I'm focusing on, which doesn't depend on that, right, that doesn't depend, is simply when you look at the arguments that the other side made in its summary judgment argument, you had no argument to answer that required you to show the downstream users, the technicians or the neurosurgeons or the interventional radiologists or whoever, had to be actually doing this. Their argument was it is impossible to use the brain tracking, brain tracking, fiber tracking, the fiber tracking software to do this, not that you don't have evidence that anybody does. Exactly. So you didn't have to answer that because there wasn't a that to answer. Yeah, because he would have had to attack the evidence that we had to require us. That's why I claim it's, I argue it's a deficient motion of summary judgment because he doesn't attack the substantive evidence. He tries to do the attack by knocking the whole thing out by saying it's impossible to infringe because we only select unknown tissue and the patent calls for known tissue. And if you accept that the court got this completely wrong, because this is about identifying unknown tissue, then we are only obligated to answer the issues raised in the motion of summary judgment by the movement. And we did that. So, you know, there's kind of a finding the signal in the noise here problem in the briefing that's that's presented some challenges. I appreciate that. But that's, you know, certainly the key piece of it is, because then I would then go on to say an argument that if the court found, you know, there is a either because the court's right on that or because there is a substantial opportunity that we were required. He argues that therefore we were required to bring in the specific event specific bits of evidence, even though the movement hadn't raised them. And that's where we objected in the motions reconsideration. This was like a sua sponte after the fact decision. He's telling us only at the time of issue in order that we're going to have to respond to something that the moving party hasn't hasn't asserted. Do you happen to remember, does the joint appendix contain the actual motion for reconsideration. If you don't remember don't. Yes, it does. Okay, I'll look at. Okay, I see it. Thanks. So, And I, and I appreciate that that you save a lot of time focusing on these on these key issues, but I identified where to look in the patent for this fact that we're addressing unknown orientations. That's why you have to take the multiple directions do the calculation is to is to find the directions is just like sequencing a DNA, find where the actual sequences, find what the actual orientations are because once we figure out the orientations of each little voxel in the brain, we can then march from point to point and map out these connections transform neuroscience and save thousands of lives, which is what this is done. So, I'll hold over my, if I may additional time to my rebuttal and allow brain lab to proceed. Yes, thank you. Mr Campbell, may I please support. I want to address a couple questions from Judge Toronto first asked about claim construction in the courts claim construction the court adopted completely. Neurographics claim construction. There was an issue as to what selected structure meant but it wasn't really a claim construction issue on selected structure. It was whether according to neurographics, you could interpret the word ROI region of interest or region to be the same thing as a selected structure. The specification does talk about selecting a structure. There are many indications as to how you can select the structure. Those structures can be known advanced peripheral nerves are known advanced. The optic nerve position is known in advance other nerves peripheral nerves around the brain are known in advance. They selected that language to use the specification may be broader and may talk about choosing regions, but that's not what they claimed. Put aside that so a selected structure is just a brain structure that somebody choosing to adopt to implement this method chooses to subject to the method. Anisotropic structure first. Yeah, the other region, right, but you lost on peripheral, right? You lost on peripheral. You've lost on zero anisotropic, right? So and then you said. Our software cannot do what this says because it actually maps everything and not just one thing. And the claim is not a pick out one and do only one. As long as you've got one, you can be mapping everything under the sun as long as you've got one. Well, that's not true. And in our motion for summary judgment, specifically appendix 7322. And on we talk about the fact that none of our customers use it the way they claim. None of our customers use it to select the structure, whether it be in advance, no matter what kind of structure it is, whether it be a peripheral nerve or a nerve in the brain or a white matter that you don't see in advance. Because the way Brain Lab uses it is we've got a neurosurgeon and he wants to perform some kind of surgery around gray matter, typically matter that doesn't have anisotropy. And he wants to see or she if there is a fiber, a white matter fiber near that. So he doesn't know and she doesn't know in advance the whole purpose of doing fiber tracking is Brain Lab markets. Everybody knows that there's this pyramidal structure in the brain, right? What more do you need? Say, I want to do this to find the damn thing. Well, if you wanted to do to find the pyramidal structure, you could. Or maybe you want to find something else. You want to find it. Right. You may want to find something else. But the key to Brain Lab's use of it is we don't select anything in advance. We just run it. And in fact, as neurographics argues in Section 3 of the brief, Brain Lab runs fiber tracking in advance of anything before a user selects any structure, whether or any region of interest. It's only after the region of interest that you see these fibers. The neurologist or the neurosurgeon says, I'm about to do some surgery in the following area of the brain. I really want a precise map of a bunch of things that I would like to stay away from. Why isn't that selecting a structure? And so we're going to use fiber tracking tomorrow. I'm going to use fiber tracking, and I'm going to use fiber tracking to select a region around it. No, no, no, no. You're not using it to select it. You selected it. I want to know where the pyramidal tract is. And so now I'm going to run fiber tracking. Selected is just, this is one of the things I am looking for when I do this process. That's not as the parties interpreted it. The parties interpreted it looking for a structure that you know is there. Looking for a nerve that maybe... I'm sorry, why is that different from what I'm at least... Because we're looking for some known structure. You know that there's a pyramidal tract in there. You know that there's a pyramidal, but... Pyramidal, is that how you say it? Sorry about that. I'm sorry? Pyramidal, I'm sorry, I'm not familiar with the... Dr. Phil, or... Okay, we'll say pyramidal, good. I corrected me several times, and now I think I say it at least the way he says it. But you're getting back to the point. Never did neurographics introduce any evidence that brain labs customers use it to find the pyramidal structure. It didn't introduce any evidence that they use it in any fashion. There was no evidence that brain lab customers even use it. Your advertisements and manual were in their opposition to summary judgment. That you could use it to find the pyramidal structure. And really, it's a contestable proposition that people were using this without having in their mind any idea of a structure that they were hoping to map. Really? Yes, yes. We had testimony from... No, but how can that be? We have testimony... These are very serious procedures. True. It really has to be the supposition for the entire structure is that these are administered by experts. Claims are very broad. Claims don't include the limitations you're telling us about. Well, the claim does require you to select... 36 doesn't talk about white matter. It says we're looking for the shape and position of structure. And of course, there are the suspicions based on all of the peripheral evidence that there may very well be a structure in the brain. We are looking for the position of a selected anisotropic structure, a selected nerve.  It's not in the claim. I'm sorry? It's not in the claim. Yes, it is. The selected structure isn't any structure. It's a selected structure that exhibits diffusional anisotropy. In other words, it's white matter structure. Now, much of this white... And the diffusion gradients? Mm-hmm. Where... It's step eight. I'm trying to put it together. The claims are quite broad. In some fashions, it is, but it's not because it does say selected structure and it says that throughout. As neurographics would do, they just eliminate that completely. They say you can select any area of the brain and any areas of structure. But that's not true. You have to have a selected anisotropic structure, which basically is a white matter. Did you say in your summary judgment motion, and if so, where? No user... There is no evidence that any user of fiber tracking undertakes to use fiber tracking with the idea in mind of trying to map an anisotropic structure. No, we say that we don't do it trying to find any known isotropic structure. And that was the testimony of the experts and the users. I'm sorry, but known, and it seemed to me you're the most interested... You had Sung, Leach, and Moseley, right? Yeah. And Moseley expressly has a paragraph that says, I interpret the claim language of selected to require... I forget whether his is orientation or location. Mm-hmm. There's orientation, location, and position between Sung, Leach, and... Well, no, they all assume that that means you're selecting something, and you're going to try then to track it. But Moseley, for example, does not say, no user of this system has in mind a structure that any neurologist would know is anisotropic and is using this software to get a precise map of it. On its face, it sounds preposterous to me. I'm not an expert, but what else are they using this for? They use it to see if there is a structure. It doesn't have to be a perimeter structure. It can be any structure, any white matter anisotropic structure that is passing through... And that there's no user of the fiber tracking system that has in mind such a structure that they're looking to map precisely... In advance? In advance. There's no testimony from anybody, no evidence from anybody. Where did you say in the summary judgment motion that if you assume that selected structure simply means a structure that a user wants to subject to this process and get a precise map of, that there is no evidence that any user of the system does that? Yes. In 7.3.2.2 and a couple of pages that follow, they incorporate statements from Dr. Leach and Dr. Sung, both of which say they do not look to... Right, but all of those three statements, Leach, Sung, and Mosley, they all come in that very paragraph at the bottom, 22 and 23. Right. All build in the assumption that you already know the location. They are building on the assumption that if you... That the way they use brain lab system is you don't look for anything in specific. You're not looking for, for example, a pyramidal structure. You're not looking for any known structure, any pre-selected structure. You just want to find out what is around that tumor. That's what they're concerned about. Because there may be fibers that go from that tumor to another part in the brain and they don't want to intersect them. The standard diagnostic procedures that you're talking about, I can't find such a distinction being drawn as to whether you know or don't know in advance what you're going to find. Well, isn't that the whole use of the word selected? And in fact... But you just said, right? You're scanning this area because there are structures you know you don't want to... Well, you don't know. No, you don't know. You don't know what's there. That's why... That's the difference between... Really, the people who are running this don't know that there's a pyramidal structure in the brain? No, they know there's a pyramidal structure. But they don't know the pyramidal structure is anywhere near the tumor. And in many cases, it's not. It's nowhere near it. They have a tumor and they want to know what's around it. And that's why they run it. They don't know there's a pyramidal structure right next to it and they're trying to see how close. They don't know that there's any white matter structures, significant ones, next to it. All they do is... And this is what the experts said. There was no testimony from any expert whatsoever or any testimony that neurographics admitted saying as to how anybody uses this. The only testimony was from Leach and Sung. I'm sorry. No testimony. But there were, what, two pages from advertisements, your advertisements. But you could select a pyramidal... You could do that. No, no. I'd like to ask you to let me finish my question. I'm sorry. I apologize, Your Honor. There were, I think, two advertising pictures and one in the manual which referred to a terrific benefit of this is you can identify the location of the pyramidal tract. Why is that not sufficient evidence that it's... If you were advertising it and telling people you could use it that way, I bet there were doctors out there that were using it for that purpose, saying, I'd like to know where this tract is so that I don't do harm when I intervene. Well, there may be doctors who do that, but that's not sufficient to prove infringement. They have to do that. Now, it's just the claim wasn't as capable... I'm sorry. Why is that not sufficient to prove... We're getting beyond what I think is probably... Inducement, maybe? No, no. You said that the principal ground of the district court's decision... The inducement is just in a footnote, right? I mean, the principal ground of the district court's decision is there was no proof that anybody was directly infringing. True. Right. There is no proof that anybody was directly infringing. And that's where it ends. There was no proof. And, in fact, Neurographics admits that there was no proof. They admit that they introduced absolutely no proof and no argument of direct infringement. That should end it there. And, in fact, there is no evidence. There are two advertisements which mention pyramidal structure, but it doesn't say that you have to do that. You could do fiber tracking to find any of the other structures that aren't the pyramidal structure. And, in fact, the testimony of our experts is that's how they do it. They're not looking specifically for the pyramidal structure. Right. But why if... Some of your summary judgment brief, and I guess some of your brief here, suggests that for there to be a selected structure, the result of the process has to be limited to mapping that one and not mapping anything else. Yes. We argue that as well. Right. Because you're not... There's nothing in the claim about that, right? Well... This is all... The fact that you select a structure doesn't mean that you're not interested in or even getting the information about everything else surrounding it. All this says is that you have to scan... I'm using scan as a right word. Expose... Yes, exposing a region that contains a selected structure. It doesn't say that you are exposing a region that contains... This would be silly, but contains that structure and no other structure. Well, it doesn't say that structure and no other structure. Right. I agree with you. It says a selected structure. So you're scanning... It says selected structure and other structures. Right. The region you scan must or is supposed to include the selected structures and other structures. But still it says just not... It doesn't say the region includes anisotropic structures and isotropic structures. It says a selected anisotropic structure. That's step A. It says selected that exhibits diffusion anisotropy and other structures that do not exhibit diffusion anisotropy. True. But it says a selected structure that does. So what does selected mean? Selected must mean that you're looking for something in specific. Right? So you first scan and you select the structure and then you run another one for precision and so on. And there it is. You only run it once. You don't run it first to look for a structure and then run it again. But that really is... That is the whole issue that you run it. You don't run it just for fun, just to see what different colors are going to turn up in your brain scan. Sure, you're right. But you run it to... Significant information to start with before you do all of this, I would think or hope. Well, no. And that's the key between, I think, the patent and what Brain Lab does. Brain Lab doesn't care what's there in advance. They're not looking for something... Any diagnostic procedure then would not meet any kind of definition of diagnostic procedure because you're looking for something whose presence you then verify when you conduct the procedure. And why doesn't that apply to the way this claim is written as a selected structure? Well, because it requires, I guess, selected structure. It doesn't say any structure that exhibits the diffusional anisotropy and isotropic structures. It says a selected structure. So you have to have some structure that you know something of advance. You believe it's there. Maybe the parameter track. You believe that there's a structure here, and that's what you're selecting, and that's what you're looking for in advance. When Brain Lab uses its device, it just draws a region of interest around a tumor. But was the summary judgment based on that, or was it based on absence of evidence of actual, as opposed to contributory infringement? Well, it was based on the fact that plaintiffs produced no evidence of anybody using fiber tracking in any manner, in any manner whatsoever, and especially not in the manner which they argue, their hypothetical use, which is essentially to always find the parameter structure. And so your brochure with instructions, you're saying that the instructions in the brochure as to what this system can do are insufficient. Yes. It doesn't say you must select a parameter structure. It doesn't say you must select anything. In fact, the manual for fiber tracking doesn't use the word parameter. It doesn't say you have to use it in a certain way. The patent doesn't even – The manual doesn't. That's just the advertisement. Is that right? I thought there was one reference in the manual. Am I misremembering that? The manual never talks about – No, no, no. Mr. Filler is pointing out that we're running over time. I understand we've run over time. I'm just trying to finish the answers to the questions. Is there anything else you need to tell us? I think I just want to conclude by saying that never did NeuroGraphics introduce any evidence that anybody uses brain lamps device in any way, in any fashion, whether it be some infringing method that finds a parameter structure or does anything else, all the non-infringing methods. And the court found there were both infringing possibly methods and non-infringing methods. And mentioned just briefly, Suus Pante never did NeuroGraphics argue Suus Pante in any of the briefs, and it was not in their motion for reconsideration. So we believe the judge's opinion below should be affirmed. Thank you very much. Thank you, Mr. Campbell. And, Your Honor, I appreciate if I talked over you a couple times. I was just getting excited. Will you add to Mr. Filler's time the amount we've run over, Mr. Campbell? Thanks very much. So I did want to address this issue of – that you should know that in the event that you reverse and remand, that the record does contain exactly what Mr. Campbell says it does not. And that's why I was pointing to that particular page, beginning 06050. Because neurosurgeons know there's errors in the brain. You could take out a large amount and have not much trouble for the patient. In other parts where you have a devastating injury from a tiny amount. And the pyramidal tract is one of these. And, yes, pyramidal tract is named specifically in the manual. That is correct, Judge Turner. So what happens in Figure 9 is they tell us that they use this fMRI to locate Broca's and Wernicke's area. What are these? These are – I talk about that there are no unknown structures. It's the unknown detail. Broca's is speech generation, discovered in 1861. People had a series of – he had a series of patients who lost speech. And then they died, and he sectioned the brain and found the injury. That was motor speech. And Wernicke's, around the same year, 1861, Wernicke in Germany found receptive speech area. If it was injured, people could no longer understand speech. Now, 10 years later, they found that connecting the two, motor speech and receptive speech, was a tract, which they called the arcuate fasciculus. And that's what this image is about. Because this patient has a tumor between the motor speech area and the receptive speech area, pushing the arcuate fasciculus out of place. And they want to know, can we get the tumor out without injuring the arcuate fasciculus? And they use Brain Lab to find out exactly where the arcuate fasciculus has been pushed to by the tumor, and where the edges are. This is exactly, exactly laid out. They're doing something that appears in the patent, specifically talks about exactly this issue of the parts of the brain, the tracts that emerge from the speech areas. And the use of fMRI, which is something called BOLD, or bold imaging, to identify a functional area, that also appears in the manual. Which I'm sure Mr. Campbell will have to agree to. So, on remand, yes, absolutely, evidence before the jury will include this user of Brain Lab wanting to avoid injury to this tract, exactly as you've just been disputing. They've set out to do this. They know the tumor is near the arcuate fasciculus. And if they hit the fasciculus, they're going to severely impair the patient's speech. They're going to know exactly where it is. They pick the two structures using Brain Lab. It's totally capable of this, with this intention. And in fact, the manual tells them to use BOLD imaging for this, and for a pyramidal tract, and they advertise for it. And that's what neurosurgeons want. And so, Mr. Campbell, what you may have noticed about all of his experts, is they all say just about the same thing, and that didn't happen by chance. So, I think that you're looking at a legal argument, and not a true medical opinion. The other issue that he raises about selecting a structure is to suggest that somehow it means that you have to select the entire structure. But the method in the patent, the Claim 36, is really at a single voxel. You just have to select a structure, because that's the level at which it determines the orientation. It does it voxel by voxel. So, again, I won't use up all my time, but I believe that the judge, Honorable Judge Stearns, was wrong when he found it was a substantial, non-infringing use. He uses that. He points to Toshiba to say, therefore, you did have to bring extra specific evidence in, even though they didn't cite, even though they didn't attack the other evidence. We don't say there's no evidence infringement. We do. We don't admit that. We just say, you always infringe. Whenever you do these things, you're infringing, because there's no non-infringing use. That's our response. They're saying, we don't have to attack the evidence, because we never infringe. We come back and say, you always infringe. The court decides it by saying, ah, there's unknown tissue, and I don't think the patent covers unknown tissue. 100% wrong. That needs to change. It reverses the whole thing. They have a deficient motion in that. It didn't cite individual infringement, but if we take it as a valid motion, it is sufficient. It argues one thing. You can't infringe. The answer is, the judge got it wrong. They always infringe, and that's why the motion for summary judgment must fail, because there is substantial evidence of infringement, which a jury could readily find. This is not a position of a judge to prevent this from getting in front of a jury. Thank you very much. Thank you. Thank you both. The case is taken under submission. That concludes our argued cases for this morning and afternoon. All rise. The Honorable Court is adjourned until tomorrow morning. It's at o'clock a.m.